## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )    Criminal No. 06-368 (RJL/DAR) |
| | ) |
| JAMES A. AUSTIN, | ) |
| | ) |
| Defendant. | ) |

**FILED**

**MAY 0 2 2008**

**Clerk, U.S. District and Bankruptcy Courts**

### DEFENDANT'S OPPOSITION TO GOVERNMENT'S MOTION TO RECUSE

Defendant, James A. Austin, through undersigned counsel, respectfully submits this Opposition to the Government's Motion to Recuse.[1]

In its Motion, the government offers a highly superficial analysis of both the facts of this case and the caselaw interpreting the recusal statute, 28 U.S.C. § 455(a). When the facts and the law are analyzed appropriately, it is abundantly clear that recusal is not warranted in this case. Indeed, under the government's reasoning, recusal would be required in every case involving an alleged threat to the presiding judge--a notion the courts have emphatically rejected. Accordingly, the defense respectfully requests that the Court deny the government's motion.

---

[1]    The government has apparently abandoned its request that the Court "should [not] have any more contact with these proceedings at this time up to and including considering the motions." April 14 Tr. at 28. The government's failure to pursue this argument was inevitable, as defense counsel could find absolutely no authority supporting the government's request that a judge should not consider a motion to recuse him or herself in the first instance. In any event, as the government has failed to include that request in its written motion, the government's argument that the Court recuse itself prior to deciding the motion to recuse should now be considered waived.

## BACKGROUND

Mr. Austin has suffered from mental illness for over 35 years. *See, e.g.*, Psychiatric

Report (Dr. Sarrazin), November 29, 2007 ("Mr. Austin's mental health history shows a long

history of psychiatric illness and hospitalizations. His mental health problems appear to have

begun prior to 1973"). Most, but not all, of that time has been spent in state and federal prisons

(including federal medical centers), the D.C. Jail, and state mental institutions, including St.

Elizabeth's Hospital. Mr. Austin has also had periods in the community, including from 1996-

1999, and 2000-2002.

Mr. Austin's history of allegedly threatening judges appears to have begun in 1973,

following the onset of his mental illness. Mr. Austin's Pretrial Services report reflects convictions

for mailing threats to judges in 1973 and 1976.[2] The government has further alleged that Mr.

Austin has, since 2002, threatened at least four Superior Court judges. *See* discussion, *infra*.

In September of 2002, Mr. Austin was charged in Superior Court with arson and other

offenses relating to an incident where he allegedly burned a trash can full of leaves in his mother's

backyard.[3] In December 2002, Mr. Austin was declared incompetent. On December 19, 2003, the

government filed a motion in that case to medicate Mr. Austin involuntarily under *Sell v. United*

---

[2]     The threats were allegedly mailed to federal judge Tomas Lambros in Ohio and
Ohio state judge Jack Young. *See* Defense Exhibit 11 (2007 St. Elizabeth's Discharge
Summary).

[3]     As recently as the April 10, 2008 hearing in this case, government counsel
represented to this Court that the criminal conduct in the 2002 Superior Court case was that Mr.
Austin "burnt his mother's house down." April 10 Tr. at 15. In fact, as the government now
recognizes in its motion, Mr. Austin was alleged only to have set fire to leaves in a trash can in
his mother's back yard.

2

*States*, 529 U.S. 166, 189 (2003).[4]  The Department of Mental Health subsequently filed a petition

for Mr. Austin's civil commitment pursuant to D.C. Code § 21-541 (Superior Court MH No. 553-

04).  That petition was granted and remains in place today under Superior Court Case No. 06-

MHE-11.  The government dismissed Mr. Austin's 2002 Superior Court case on March 11, 2005.

On September 23, 2006, Mr. Austin was indicted in Superior Court for allegedly issuing

threats to his mother.  Judge Ramsey Johnson of the Superior Court for the District of Columbia

was eventually assigned to preside over the case.  In approximately October of 2006, St.

Elizabeth's involuntarily medicated Mr. Austin with anti-psychotic medication, one of the many

times Mr. Austin has been involuntarily medicated.  *See* Defense Exhibit 11 (St. Elizabeth's

Discharge Summary).  That particular round of involuntary medication must have been

administered under the aegis of Mr. Austin's civil commitment, as the 2006 Superior Court

criminal case contains no indication that involuntary medication had been sought or authorized as

of October 2006, or ever.  As noted by the St. Elizabeth's medical staff in January 2007,

"[u]nfortunately, [Mr. Austin's] psychosis symptoms were not altered by administration of anti-

psychotic medication."  *Id.*

On December 4, 2006, Judge Johnson ordered that Mr. Austin was incompetent to stand

trial.  *See* Government Exhibit 1-Supp (Dkt. Sheet for Superior Court Case No. 2006-CF2-

021099).  Later the same day, December 4, 2006, Mr. Austin allegedly threatened Judge Johnson

from a telephone at St. Elizabeth's by leaving a message on Judge Johnson's chambers answering

machine.  On December 20, 2006, Mr. Austin was arrested on the indictment in this federal case,

---

[4]      The 2002 Superior Court case docket sheet does not reflect the disposition of the
government's motion.

which was based upon the alleged telephone threat to Judge Johnson. Mr. Austin made his initial

appearance in Court before Magistrate Judge Kay. According to the docket sheet, Magistrate

Judge Kay found Mr. Austin incompetent for further proceedings and ordered that he be held

without bond. *See* Dkt. Entry, 12/20/2006.[5] Later that day, Magistrate Judge Kay signed an order

committing Mr. Austin to the custody of the Attorney General for the purpose of conducting a

psychological exam to determine Mr. Austin's mental competency–the same process that had just

been completed in Superior Court several weeks before in Mr. Austin's 2006 Superior Court case.

On January 17, 2007, Mr. Austin was removed from St. Elizabeth's and transferred to the

Metropolitan Correctional Center in New York, New York for the purpose of the competency

exam.

    In a report dated February 22, 2007, Dr. William Ryan, a staff psychologist at the

Metropolitan Correctional Center, concluded that Mr. Austin is currently incompetent to stand

trial (the same conclusion that had already been reached by Judge Johnson on December 4, 2006,

less than three months earlier, in an order declaring Mr. Austin incompetent). On March 14,

2007, Mr. Austin was ordered to FMC Springfield for a period of observation to determine

whether Mr. Austin could be restored to competency under 18 U.S.C. § 4241(d). On July 31,

2007, Dr. Chad Brinkley, a psychologist at FMC Springfield, issued a report opining that Mr.

Austin would likely not be restored to competency and recommending a hearing under *Sell v.*

*United States*, 529 U.S. 166, 189 (2003).

    Subsequent to the report from FMC Springfield, the government moved once again to

---

    [5]    For unknown reasons, the U.S. Marshals returned Mr. Austin to St. Elizabeth's
following the December 20 court appearance, despite the existence of this Court's commitment
order, which should have held him at the D.C. Jail.

medicate Mr. Austin involuntarily under *Sell*. On October 26 and 30, 2007, this Court conducted evidentiary hearings with respect to the government's *Sell* application. At the conclusion of the October hearings, the Court continued the *Sell* hearing (upon the government's request, and over defendant's objection) so that the government could present additional evidence. Mr. Austin was returned to FMC Springfield so that the medical staff there could develop a proposed treatment plan under, *inter alia*, *United States v. Evans*, 404 F.3d 227 (4th Cir. 2005). The *Sell* hearings were resumed on January 28-30, 2008, and then concluded on February 11, 2008. Following the conclusion of the hearings, the Court took the *Sell* issue under advisement to prepare its Report and Recommendation for Judge Leon.

After the conclusion of the *Sell* hearings on February 11, 2008--and unbeknownst to this Court or defense counsel--the parties resumed proceedings in Mr. Austin's 2006 Superior Court case. By Order of the Superior Court for the District of Columbia, Mr. Austin was transferred from the D.C. Jail to St. Elizabeth's Hospital, John Howard Pavilion, on or about March 4, 2008. By March 31, 2008, Mr. Austin's doctors at St. Elizabeth's had prescribed Mr. Austin Zyprexa (Zydis), 10 mgs., but Mr. Austin was refusing the medication. Mr. Austin's doctors then referred Mr. Austin for involuntary medication. A St. Elizabeth's Medication Review Panel met on April 7, 2008 to consider the issue of involuntarily medicating Mr. Austin. On April 8, 2008, Mr. Austin was involuntarily medicated with anti-psychotic medication.

On April 10, 2008, the Court held a status hearing at defense counsel's request. The underlying bases for the hearing were (1) Mr. Austin's transfer out of federal custody to St. Elizabeth's, and (2) the involuntary medication procedure that St. Elizabeth's had undertaken against Mr. Austin on April 8, which had included actual administration of anti-psychotic medication. Mr. Austin appeared in Court for the April 10 hearing but was subsequently removed

prior to the conclusion of the hearing.  The transcript of the hearing reflects the following

exchange during the time period Mr. Austin appeared in Court:

> THE MAGISTRATE JUDGE:  Very well, just make sure that you give everything
>
> to Ms. Webster and to opposing counsel, so that everyone will be prepared once we
>
> go on the record.

(Recording interruption)

> MR.        :  Shhh!
>
> MR.        :  _____ use force, Officer.
>
> MR.        :  You're not _____?
>
> MR.        :  You _____ hey, Mr. Austin, come on!
>
> MR.        :  And here I'm going to take you back to --
>
> MR.        :  Mr. Austin!
>
> MR.        :  I don't give a shit _____.
>
> MR.        :  Your Honor, can I have a brief moment?
>
> THE MAGISTRATE JUDGE:  Certainly.
>
> (Recording interruption)

Ex. 1 (April 10 Tr., pp. 1-3).

Based upon the events of the April 10 hearing, the government has now moved to recuse

the Court.  As the government acknowledges, recusal of the Court at this stage of the proceedings

would have the effect only of preventing this Court from issuing its Report and Recommendation

on the *Sell* issue to Judge Leon.  No further hearings are currently scheduled in this case.

**DISCUSSION**

I.    **UNDER THE FACTS AND THE LAW, THE COURT SHOULD DENY THE
      GOVERNMENT'S MOTION TO RECUSE.**

    A.  **The Legal Framework For Determining Recusal In An Alleged "Threats" Case.**

Under section 455(a), courts determine whether to recuse under the "objective standard"

articulated in *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). That

standard asks "whether a reasonable person perceives a significant risk that the judge will resolve

the case on a basis other than the merits." *In re Mason*, 916 F.2d 384, 385 (7th Cir. 1990).

Importantly, "[t]he reasonable third-party observer is not a partly informed man-in-the-street, but

rather someone who understands all the relevant facts and has examined the record and the law."

*United States v. Holland*, ---- F.3d ----, 2008 WL 696903, *4 (9th Cir.) (internal quotation marks

and citation omitted); *see also Clemens v. U.S. Dist. Ct.*, 428 F.3d 1175, 1178 (9th Cir. 2005)

("[t]he reasonable person in this context means a well-informed, thoughtful observer, as opposed

to a hypersensitive or unduly suspicious person"). The standard "must not be so broadly

construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest

unsubstantiated suggestion of personal bias or prejudice." *United States v. Cooley*, 1 F.3d 985,

993 (10th Cir. 1993).

In determining whether the foregoing test of met, courts have noted that, under section

455(a), "a judge has as much obligation not to recuse himself where there is no reason to do so as

he does to recuse himself where the converse is true." *United States v. Greenspan*, 26 F.3d 1001,

1005 (10th Cir. 1994) (citation omitted) (upholding determination by district judge not to recuse

despite judge's knowledge of an "alleged conspiracy to kill the judge and his family [that]

spanned several states and included a number of persons who had allegedly contributed large

sums of money for the hiring of a 'hit man'); *see also Holland*, 2008 WL 696903 (9th Cir.) (judge

did not err when failing to recuse himself after defendant "obtained the sentencing judge's home

telephone number, which he called, leaving more than one threatening message on an answering

machine").[6]

      Thus, in cases involving alleged threats against the presiding judge, it is axiomatic that

"[n]ot every threat made against a judge should force recusal." *Id.* at \*4; *see also United States v.

Gamboa*, 439 F.3d 794, 817 (8th Cir. 2006) ("recusal is not automatic on the mere basis of the

judge's knowledge of the threat"). In *Holland*, the court set forth three factors judges may

consider in determining whether to recuse based on an alleged threat. The relevant factors are:

> (1) *The defendant's capacity to carry out the threat.* Has the defendant taken
> concrete steps to carry out the threat? Does the defendant have a history of
> violence or has he previously been successfully in carrying out other threats? Is
> he a member of a gang or does he have accomplices or contacts who could carry
> out the threat on his behalf?
>
> (2) *The defendant's demeanor and the context of the threat.* Was the threat
> made in a fit of passion or intended as a joke? Was the defendant serious in
> carrying out the threat? Does the judge have any prior dealings with the
> defendant that make the threat more or less likely to be carried out?
>
> (3) *The perceived purpose of the threat.* Was the threat made in open court or
> did the judge become aware of the threat only through the fortuity of a law
> enforcement investigation? Was the threat an attempt to force recusal and
> manipulate the judicial system?

*Id.* at \*4. With respect to these factors, the *Holland* court stated "the [third and] final factor is,

perhaps the most important." *Id.* Likewise, in *Greenspan*, the court noted the importance of

whether the threat was made in open court, or learned about through an extra-judicial source, such

---

[6]     Courts have also stressed, of course, that "if a judge feels that his personal safety
or the safety of his family is in danger, he may *always* recuse himself *sua sponte* from such a
matter. Recusal in such situations is left to the discretion of the threatened judge; we generally
do not review a judge's decision to recuse himself." *Holland*, 2008 WL 696903 (9th Cir.), at \*2
(emphasis in original).

as law enforcement.

> We [have] observed that this threat was not delivered in court or in connection
> with an official judicial proceeding involving this defendant. Thus, the threat is
> properly characterized as an 'extrajudicial source.' As such, the Supreme Court
> has recently advised that it has a higher potential for generating a situation where
> the judge's impartiality might reasonably be questioned that would be the case is
> the incident arose during the course of the proceedings themselves.

*Greenspan*, 26 F.3d at 1006-07 (citing *Liteky v. United States*, 510 U.S. 540 (1994)).

### B. The Recusal Factors Weigh Heavily Against Recusal Of The Court In This Case.

In this case, when the entire record is considered, the risk that a "well-informed,

thoughtful" observer would perceive a risk of this Court acting on anything other than the merits

is practically zero. Indeed, every factor in the recusal analysis weighs heavily in favor of this

Court denying the government's motion to recuse.

#### 1. "The defendant's capacity to carry out the threat."

Under the first factor, the defendant's capacity to carry out the threat, that capacity is

obviously nil. Mr. Austin is held without bond in this case and, in addition, is civilly committed

under Superior Court No. 06-MHE-11. The government points to Mr. Austin's history of sending

threats to other judges, but of Mr. Austin's many alleged judicial threats, there is not a scintilla of

evidence Mr. Austin has ever attempted to make good on a single one, despite significant time out

in the community. Likewise, there is no evidence whatsoever that Mr. Austin "has taken concrete

steps to carry out" the alleged threat to this Court. *Id.* at *4. Mr. Austin is a mentally ill

individual who has been institutionalized for the majority of his life; he is certainly not a member

of a gang, nor is he someone with "accomplices." *Id.*

9

### 2. "The defendant's demeanor and the context of the threat."

The context of the threat in this case is that Mr. Austin is an individual with a very long and sad history of mental illness. Since the 1970s, but with recurring frequency since 2002, Mr. Austin has been bounced like a human pinball among various federal and state prisons, D.C. Jail, and mental institutions such as St. Elizabeth's Hospital. Throughout the *Sell* hearings before this Court, Mr. Austin acted with entirely appropriate courtroom demeanor. It was only after Mr. Austin was incorrectly transferred our of federal custody to St. Elizabeth's, and St. Elizabeth's began involuntarily medicating Mr. Austin on April 7, that there was an alleged departure from that standard. It is noteworthy that Mr. Austin's alleged threat to Judge Johnson on December 4, 2006 also occurred after St. Elizabeth's began medicating him on an involuntary basis in October 2006.

Under the particular circumstances of Mr. Austin's case, there is little reason to believe that Mr. Austin's conduct in Court on April 10 was motivated by anything other than mental illness and the extreme frustration that must accompany his circumstances. The "context" of the threat accordingly dictates against recusal of this Court.

### 3. "The perceived purpose of the threat."

Under the third factor, courts look to "the perceived purpose of the threat." As explained more fully in *Holland*:

> The [third and] final factor is the most important. Not every threat made against a judge should force recusal. If so, defendants could readily manipulate the system, threatening every jurist assigned on the 'wheel" until the defendant gets a judge he preferred. Also, the defendant could force delays, perhaps making the cases against him more difficult to try, perhaps putting witnesses at greater risk. Such blatant manipulation would subvert our processes, undermine our notions of fair play and justice, and damage the public's perception of the judiciary. We agree with the Eighth Circuit that 'recusal is not automatic on the mere basis of the judge's knowledge of the threat.'

*Holland*, 2008 WL 696903, *4 (quoting *United States v. Gamboa*, 439 F.3d 796, 817 (8th Cir. 2006)).

Here, the *Holland* court's concern with protecting the judicial process would be very ill-served by recusal. While Mr. Austin may not have acted from a conscious desire to manipulate the system, it should be undisputed that he acted while in a state of mental illness. The recusal analysis should therefore be the same, as the effects on the judicial system are the same.[7] And the courts have uniformly held that under such circumstances, recusal is not warranted.

For example, assume a hypothetical defendant who threatens every judge he comes before. Is it really the government's position that every judge who hears such a threat must be recused because of the "appearance of impropriety," and the process started all over again? How would the case ever reach a conclusion? In this case, if the government's motion to recuse were granted and something then happened before Judge Leon, would this case then have to be moved to another judge and begun yet again? A "well-informed, thoughtful observer" would certainly understand why federal judges would decline to act in such a nonsensical manner, which serves the interest of no party to this case, nor the judiciary. Avoiding such absurd outcomes is precisely why *Holland* and other courts have made clear that "[n]ot every threat made against a judge should force recusal." *Id.; see also Gamboa*, 439 F.3d at 817; *United States v. Cousins*, 2007 WL 1454275 (N.D. Ohio.), *8 n.5 (court declined to recuse itself after death threat against judge "on the premise that if the Court recused and the case was assigned to another judge, the defendant would be encouraged into making similar threats with similar recusal motions").

---

[7]      None of the cases cited by the government involve a defendant who is mentally ill and certified as presently incompetent to stand trial. As the cases direct courts to consider whether the alleged threats are "genuine," *see, e.g., Holland*, 2008 WL 696903, *4, part of that consideration must be the mental health of the defendant.

In addition, it should also be noted under this factor that the Court learned about Mr. Austin's alleged threat because it was made in open court, and not though some extrajudicial source such as law enforcement.  Under the caselaw, alleged threats made in open court have a lower "potential for generating a situation where a judge's impartiality might reasonably be questioned."  *Greenspan*, 26 F.3d at 1006 (citing *Liteky,* 510 U.S. 540).

### 4. Judicial Economy.

Finally, though not specifically noted in *Holland*, both the government and the defense appear to agree that the Court should consider the procedural posture of the case in determining the recusal motion.  *See, e.g.,* Gov. Mot. at 8 ("the Government notes that the extensive written briefings, the hearings, and the oral arguments can be submitted to Judge Leon for his independent determination of the merits of the motion without this Court's making any post-threat findings of fact and recommendations").  Here, at the time the alleged threat was issued, this Court was nearly at the end of its presently assigned role in this case, *i.e.*, the issuance of a Report and Recommendation to Judge Leon on the government's *Sell* application.  Both the Court and the parties had invested very substantial resources and effort in the *Sell* hearings.[8]  While the government's argument that submitting the transcripts and briefings to Judge Leon would "preserve[] all the time and attention that the Court and the parties put into the *Sell* proceedings,"

---

[8]     As this Court observed at the April 10 status:

> This Court has taken quite seriously the charge that is set forth in *Sell*.  We have heard testimony from witnesses.  I have heard arguments from counsel.  We have consumed hours upon hours over the course of several days so that the Court will be able to address the issues that must be addressed[.]

April 10 Tr. at 55.

Gov. Mot. at 8, that is obviously untrue.[9]  Indeed, if it were that simple, there would be no purpose served by the Report and Recommendation process in the first place.  Given the late stage of the case before this Court, recusal would represent a significant waste of resources, while serving no identifiable purpose.  Respectfully, a "well-informed, thoughtful observer" would view recusal on this record, at this late stage of the proceedings, as a needless waste of substantial judicial resources.

## CONCLUSION

In sum, every factor underlying a court's decision to recuse itself in a so-called "threats" case militates in favor of this Court denying the government's Motion.  Accordingly, the defense respectfully requests the Court deny the government's motion and retain the case until it issues its Report and Recommendation to the District Court on the government's application to involuntarily medicate Mr. Austin under *Sell*.

Respectfully submitted,

A.J. KRAMER
Federal Public Defender

_____/s/_____
Jonathan S. Jeffress
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Ste 550
Washington, D.C.  20004
(202) 208-7500, ex. 134

---

[9]     For example, the hearings included the testimony of two live witnesses.  The Court's assessment of that testimony, just like a jury's assessment of testimony, will usually include factors that may not be readily apparently from the written record, such as demeanor. *See, e.g.*, Criminal Jury Instructions for the District of Columbia, Instruction 2.11 (Credibility of Witnesses) (instructing that in reaching credibility determinations, jury may consider "demeanor and behavior of the witness on the witness stand").

**FILED**

MAY 0 2 2008

Clerk, U.S. District and
Bankruptcy Courts

# Exhibit

# 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                           :
UNITED STATES OF AMERICA   :
                           :
       vs.                 :    Criminal No. 06-0368
                           :
JAMES ANTHONY AUSTIN       :
                           :
       Defendant           :
                           :    Washington, D.C.
- - - - - - - - - - - - - - x    April 10, 2008

**FILED**

MAY 0 2 2008

Clerk, U.S. District and
Bankruptcy Courts


TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Government:     JEAN SEXTON, ESQ.
                        Assistant United States Attorney

For the Defendant:      JONATHAN JEFFRESS, ESQ.
                        Federal Public Defender Service

Proceedings recorded by the Court, transcript produced by

Pro-Typists, Inc., 1012-14th Street, N.W., Suite 307,

Washington, D.C.  20005, 202-347-5395

M2439A/bf

3
3

```
 1                      P R O C E E D I N G S
 2              THE MAGISTRATE JUDGE:  Very well, just make sure
 3   that you give everything to Ms. Webster and to opposing
 4   counsel, so that everyone will be prepared once we go on
 5   the record.
 6              (Recording interruption)
 7          MR.          :   Shhh!
 8          MR.          :   _____ use force, Officer.
 9          MR.          :   You're not _____?
10          MR.          :   You _____ hey, Mr. Austin,
11   come on!
12          MR.          :   And here I'm going to take you
13   back to --
14          MR.          :   Mr. Austin!
15          MR.          :   I don't give a shit _____.
16          MR.          :   Your Honor, can I have a brief
17   moment?
18              THE MAGISTRATE JUDGE:  Certainly.
19              (Recording interruption)
20              THE CLERK:  We are back on the record in Criminal
21   Case Number 06-368, the United States of America versus
22   James Austin.  Jean Sexton for the Government; Jonathan
23   Jeffress for the Mr. Austin.  This is here for a status,
24   Your Honor.  Mr. Austin is not present.
25              THE MAGISTRATE JUDGE:  Now, good afternoon.
```

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 06-368 (RJL/DAR)** |
| | ) | |
| **JAMES A. AUSTIN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Upon consideration of the government's Motion to Recuse, defendant's Opposition

thereto, and the entire record in this case, it is hereby

**ORDERED** that the government's Motion to Recuse is **DENIED.**

**SO ORDERED.**


_____
The Honorable Deborah A. Robinson
UNITED STATES MAGISTRATE JUDGE